**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

RICHARD E. COE, :

                Plaintiff,

  -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                Defendant. :

Case No. 3:10-cv-255

District Judge Thomas M. Rose
Magistrate Judge Michael R. Merz

**REPORT AND RECOMMENDATIONS**

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988);  *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978);  *Houston v. Secretary of Health and Human Services*, 736 F.2d 365  (6th Cir. 1984);  *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984).  However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.  *Garner, supra.*  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion.  *Elkins v. Secretary of Health and Human Services*, 658 F.2d  437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423.  To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

The Commissioner has established a sequential evaluation process for disability determinations.  20 C.F.R. §404.1520.  First, if the claimant is currently engaged in substantial

gainful activity, the claimant is found not disabled.  Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments;  if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1. If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded.  20 C.F.R. §404.1520(d).  Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment;  if not, the claimant is found not disabled.  Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform.  *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSD in June, 1998, alleging disability from April 20, 1998, due to a fractured pelvis, fractured tail bone, and fractured left let.  (Tr. 67-70; 78).  It is not entirely clear from the record at which stage of the administrative process the Commissioner denied Plaintiff's application because while there are indications that a hearing was at least scheduled for July, 15, 1999, (Tr. 62, 63, 66),  the record does not contain a hearing transcript nor a decision by an administrative law judge as to the 1998 application.  Nevertheless, at some point, Plaintiff did not pursue available appeals.

Plaintiff filed a second application for SSD on March 9, 2004, alleging disability from December 26, 2001, due to a crushed left leg, fractured pelvis, and fractured tail bone. *See* Tr. 240-42; 248.  The Commissioner denied Plaintiff's application initially and on reconsideration. *See*

Tr. 36-43. Administrative Law Judge Thaddeus Armstead held two hearings, (Tr. 644-57; 658-710), following which he determined that Plaintiff is not disabled. (Tr. 19-31). The Appeals Council denied Plaintiff's request for review, (Tr. 7-9), and Judge Armstead's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Armstead found that he met the insured status requirements of the Act through March 31, 2007. (Tr. 21, ¶ 1). Judge Armstead also found that Plaintiff has severe vertebrogenic disorder of the thoracic spine with residuals of remote surgery and degenerative changes of the lumbar spine, but that he does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 22, ¶ 3, Tr. 26, ¶ 4). Judge Armstead found further that Plaintiff has the residual functional capacity to perform a limited range of sedentary work. (*Id.*, ¶ 5). Judge Armstead then used sections 201.18 and 201.19 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and found there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 30-31, ¶ 10). Judge Armstead concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 31, ¶ 11).

In 1970, when he was thirteen years old, Plaintiff sustained an injury to his neck and back when he was riding in a car and a mobile trailer fell on him. *See,* Tr. 408; 489. Plaintiff had a burst fracture at T6 and underwent a fusion procedure on the left. (Tr. 621, 629, 670).

Plaintiff underwent a resection of T6 and spinal cord decompression with a graft for a progressive kyphotic disorder with spinal cord impingement in 1987. (Tr. 621-41).

Consulting orthopedist Dr. Vangelos reported on January 5, 1993, that Plaintiff's physical exam and the results of his January, 1990, and October, 1991, MRIs, (*See*, Tr. 421-23),

established that Plaintiff suffered from chronic cervical, thoracic and lumbosacral strain, compression fractures at T5 and T6 with fusion, degenerative disc disease at L3-4 and L5-Sl, disc bulge at L3-4, and an L5-S1 disc herniation. (Tr. 426-28).

On April 20, 1998, Plaintiff was involved in a head on motor vehicle collision and sustained a fracture of his left tibia-fibula, pelvis, and sacrum. (Tr. 107-75, 177-200, 201- 07, 209-16, 430-40).

The record contains treatment notes from family physician Dr. Stegall dated December, 1992, through November, 2006. (Tr. 201-07, 209-16, 362-97, 533-611).  Over time, Dr. Stegall treated Plaintiff for various medical conditions and complaints including radiculopathy pain, chronic neuralgia, and bilateral lower extremity radiculopathy. *Id.*  Dr. Stegall frequently noted that Plaintiff appeared to be in pain.  *Id.*  Dr. Stegall also frequently noted Plaintiff had a severely unstable thoracic spine which was at risk for a thoracic cord injury including paralysis. *Id.*

Dr. Stegall reported on March 12, 2007, that Plaintiff's working diagnoses included compression fracture with spinal fusion extending between T5 and T7, chronic low back pain due to lumbar degenerative disc disease with spondylosis, lower extremity radiculopathy with bilateral leg pain, and depression. (Tr. 612-16).  Dr. Stegall opined that Plaintiff had been unable to work at any gainful employment since December, 2001.  *Id.*  Dr. Stegall noted that in light of the 90% chance of paralysis, multiple specialists thought surgery was too risky. *Id.* Dr. Stegall also opined that Plaintiff was not able to  stand, walk, or sit on a sustained basis in a work environment, that he should be able to alternate between sitting and standing for up to four hours a day, that he should not repetitively push, pull, perform fine finger manipulation, or use foot controls, and that he was able to occasionally bend, squat, and lift up to 10 pounds. *Id.*   Dr. Stegall reported further that

5

Plaintiff was severely impaired in his ability to achieve goals, respond to time limits, independently perform routine repetitive tasks, tolerate regular work stress, and maintain production standards. (Tr. 617-19).

On July 30, 2004, examining psychologist Dr. Metts noted that Plaintiff was cooperative, his associations were circumstantial, he had a flight of ideas around his disability, and that he reported that he used marijuana for pain and he dealt with work stresses by "getting a buzz" and that he had suicidal thoughts but no plan. (Tr. 328-32). Dr. Metts also noted that Plaintiff was clean but unkempt, his affect was reactive with a mildly depressed quality, his mood was mildly depressed, he had ruminative thoughts but no obsessions or compulsions, and that he was alert and oriented. *Id.* Dr. Metts reported that Plaintiff's social judgment and comprehension abilities were intact, and he identified Plaintiff's diagnoses as major depressive disorder, recurrent, severe with psychotic features, and polysubstance abuse. *Id.* Dr. Metts assigned Plaintiff a GAF of 43 and opined that Plaintiff's ability to relate to others was moderately impaired, his abilities to understand, remember, and follow simple, one-step instructions and to maintain attention and concentration to perform simple repetitive tasks were not impaired, his ability to manage stress was greatly impaired, and that his ability to manage his finances was questionable due to his inability to complete serial sevens for subtraction and his drug use and it would be in his best interest to receive assistance in this area should he receive a benefit. *Id.*

Examining physician, Dr. Duritsch, reported on August 18, 2004, that Plaintiff had a normal gait, got on and off the examining table without difficulty, was able to walk on his toes, and that he could heel to toe walk. *Id.* Dr. Duritsch also reported that Plaintiff had reduced ranges of motion of his dorsolumbar spine, normal cervical spine ranges of motion, normal strength in his

6

extremities, exhibited no atrophy, reduced reflexes in his upper extremities, that he had normal sensation. *Id.* Dr. Duritsch noted the only objective evidence available at the time of his examination pertinent to Plaintiff's back was a chest x-ray dated February 24, 2004, which revealed a 50% compression of the thoracic spine. *Id.* Dr. Duritsch identified Plaintiff's diagnoses as history of thoracic compression fracture and left tibia-fibula fracture. *Id.* Dr. Duritsch opined that Plaintiff was able to lift twenty pounds occasionally and ten pounds frequently, he was not limited in his abilities to sit and walk, was not able to lift from the floor or below the knee level, that he was not able to twist, and that he was able to occasionally climb and kneel. *Id.*

An August 18, 2004, left knee x-ray showed tibia and fibula deformities consistent with old healed fracture. (Tr. 339-40). A lumbosacral spine x-ray revealed an old fracture of S2 sacral segment, spondylosis of lumbar spine with hypertrophic spurs, and marked degenerative narrowing of L3-L4 and L5-S1 disk spaces. *Id.*

Treating neurologist Dr. Kitchener reported on December 27, 2004, that Plaintiff had good motor, power, tone and coordination in his upper extremities, an increased flexor tone of his lower extremities, mild weakness in the proximal muscles, absent ankle jerks, mild loss of proprioceptive function, and diminished pinprick sensation of both legs. (Tr. 408-09). Dr. Kitchener identified Plaintiff's diagnosis as myelopathy. *Id.*

A thoracic spine MRI performed on January 10, 2005, revealed an old vertebral body compression fracture of T6 with spinal fusion of T5 through T7, with the endplate of T7 causing significant compression of the thoracic spinal cord with significant spinal stenosis. (Tr. 406). A lumbar spine MRI performed on the same date revealed a mildly diffuse bulging disc at L3-4 with no evidence of herniation or stenosis. (Tr. 405).

An EMG and nerve conduction studies of the lower extremities performed on January 20, 2005, revealed mild lumbar radiculopathy on the left, and no evidence of peripheral neuropathy. (Tr. 403-04).

Consulting pain management specialist Dr. Myers noted on March 9, 2005, that Plaintiff reported, "I hurt from the top of my head to the tip of my toes", that he used illicit drugs including cocaine and Rorer-714 (Quaalude) to help cope with his pain. (Tr. 487-88). Dr. Myers also noted that Plaintiff's extremity motion was normal, his strength in his upper extremities was normal, his strength in his lower extremities was very close to normal, and that he had no sensation along his bilateral L4 and S1 dermatomes, no sensation along his right L5 dermatome, diminished sensation over his left calf, and diminished sensation over his right thigh. *Id.*

Consulting orthopedist Dr. Amongero reported on April 14, 2005, that Plaintiff's complaints included chronic mid/thoracic back pain, low/lumbar back pain, and hip pain, and occasional twinges of pain into his right thigh and left calf. (Tr. 489-91). Dr. Amongero also reported that Plaintiff demonstrated thoracic kyphosis and diminished deep tendon reflexes bilaterally, had a normal gait, and no motor deficits. *Id.* Dr. Amongero identified Plaintiff's diagnosis as chronic thoracic pain with significant thoracic kyphosis, status post multiple fractures with fusion, and chronic low back pain secondary to lumbar degenerative and spondylitic changes. *Id.* Dr. Amongero noted that he did not think that surgical intervention was warranted and he recommended conservative treatment. *Id.*

On April 28, 2005, Dr. Kitchener, reported that Plaintiff had significant thoracic spine disease, with evidence of myelopathy and a very unstable back and a very complex back history with multiple fractures and scoliosis, had undergone decompressive and fusion procedures. (Tr. 514-15).

Dr. Kitchener concluded that because of his severe spinal cord problems, Plaintiff was not able to work for any remuneration and was totally and permanently disabled. *Id.* On May 8, 2006, Dr. Kitchener again opined that Plaintiff was not able to perform substantial gainful activity and was totally and permanently disabled. (Tr. 512).

Consulting neurosurgeon Dr. Taha reported on June 29, 2005, that Plaintiff was oriented, his mood and affect were calm, had a normal gait, normal spine and upper extremity motion, and normal strength in his extremities. (Tr. 492-93). Dr. Taha also reported that Plaintiff's sensation was intact and his reflexes were increased in the right lower extremity. *Id.* Dr. Taha noted that Plaintiff's thoracic spine MRI demonstrated severe kyphosis with draped spinal cord on top of it and a posterior fusion. *Id.* Dr. Taha opined Plaintiff should return to the Cleveland Clinic for surgery. *Id.* A thoracic spine x-ray taken in conjunction with Dr. Taha's examination revealed past surgeries of T5 through T7, significant levoscoliosis, marked compression of T6 vertebrae, and almost complete ankylosis of T5 through T7 with marked focal kyphosis. (Tr. 494).

Plaintiff was hospitalized January 9-13, 2006, after he was brought to the hospital by his wife who had stopped him from shooting himself. (Tr. 495-511). At the time Plaintiff was admitted, it was noted that he had a flat to depressed affect, paranoid thoughts, and fair impulse control. *Id.* It was also noted that a urine drug screen was positive for marijuana. *Id.* Plaintiff underwent a chemical dependence evaluation which revealed a high probability of substance dependence, given his history of smoking marijuana extensively, and misusing alcohol. *Id.* Plaintiff was treated with therapy and medication and he was discharged with the diagnosis of major depression, single episode, without psychosis and he was assigned a GAF of 70. *Id.*

The record contains a copy of Plaintiff's treatment notes from Shelby County

Counseling Center dated January 13 through November 21, 2006. (Tr. 517-32). Those records reveal that at the time of Plaintiff's initial assessment, Plaintiff reported he was depressed 5-6 days out of the week due to chronic pain and that he used cannabis two to three times a week and had no desire to stop using it. *Id.* Over time, it was reported that Plaintiff had a depressed and blunted affect, a depressed mood, his thought process was coherent and relevant, he had no delusion, he was paranoid and had auditory hallucinations one time, his concentration, insight and judgment were fair, and that at most times he had no suicidal or homicidal ideations. *Id.* Plaintiff's diagnoses were identified as major depressive disorder, moderate, alcohol dependence, cannabis dependence, and a pain disorder associated with both psychiatric and physical condition. *Id.* Plaintiff attended four group and individual counseling sessions, which focused on coping skills, anger management and relaxation techniques. *Id.*

At the second administrative hearing, a medical advisor (MA) testified that Plaintiff did not meet or equal the Listings, and was able to lift ten pounds occasionally and five pounds frequently, stand or walk for two hours in an eight-hour day, sit for six hours in an eight-hour day, required a sit-stand option, (Tr. 687-702).

Plaintiff alleges in his Statement of Errors that the Commissioner erred in weighing the medical source opinions of treating physicians Dr. Stegall and Dr. Kitchener and by failing to find his depression was a severe impairment. (Doc. 8).

"In assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). "One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-

treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544, (6th Cir. 2004), *quoting,* 20 C.F.R. § 404.1527(d)(2).

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley,* 581 F.3d at 406*, quoting, Wilson,* 378 F.3d at 544*.* "On the other hand, a Social Security Ruling[1] explains that '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley, supra, quoting,* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). "If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,*582 F.3d at 406*, citing, Wilson,* 378 F.3d at 544*, citing* 20 C.F.R. § 404.1527(d)(2).

---

FN 1.  Although Social Security Rulings do not have the same force and effect as statutes or regulations, "[t]hey are binding on all components of the Social Security Administration" and "represent precedent, final opinions and orders and statements of policy" upon which the agency relies in adjudicating cases. 20 C.F.R. § 402.35(b).

11

"Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion." *Blakley,* 581 F.3d at 406, *citing,* 20 C.F.R. §404.1527(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley,* 581 F.3d at 406-07,*citing,* Soc.Sec.Rule 96-2p, 1996 WL 374188 at *5. "The *Wilson* Court explained the two-fold purpose behind the procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. *Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Blakley,* 581 F.3d at 407, *citing, Wilson,* 378 F.3d at 544. "Because the reason-giving requirement exists to ensure that each denied claimant received fair process, the Sixth Circuit has held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley, supra, quoting, Rogers v. Commissioner of Social Security.,* 486 F.3d 234, 253 (6th Cir. 2007)(emphasis in original).

In rejecting Dr. Stegall's and Dr. Kitchener's opinions, the Commissioner essentially determined that the opinions were not consistent with the objective and clinical findings of record

12

and were highly dependent on Plaintiff's subjective complaints. (Tr. 29).

As noted above, both Dr. Stegall and Dr. Kitchener have been Plaintiff's long-term treating physicians. Specifically, Dr. Stegall has been Plaintiff's family physician since December, 1992, and Dr. Kitchener has been Plaintiff's treating neurologist since December, 2004. Both physicians have essentially opined that Plaintiff is disabled, their opinions are consistent and their opinions are supported by the objective medical evidence.

First, Dr. Stegall has consistently noted that Plaintiff had radiculopathy pain and chronic pain neuralgia. (Tr. 364, 366-69, 550-51). Dr. Stegall's office notes reveal that he determined that Plaintiff exhibited tenderness on palpation of his spine, reduced ranges of motion, decreased reflexes, and positive straight leg raising. (Tr. 533-611). Dr. Stegall's opinion is also supported by objective tests of record including radiology reports from the early 1990s which have revealed significant thoracic and lumbar spine disease. (Tr. 421-23, 427). Further, a thoracic spine x-ray performed on October 8, 1999, revealed spondylosis, and anterior wedging deformity with kyphoscoliosis, (Tr. 433), an x-ray of Plaintiff's lumbar spine performed on August 18, 2004, revealed an old fracture of S2 sacral segment, spondylosis with hypertrophic spurs, and marked degenerative narrowing of L3-L4 and L5-S1 disk spaces, (Tr. 339-40), and a January 10, 2005, thoracic spine MRI, revealed significant compression of the thoracic spinal cord with significant spinal stenosis. (Tr. 406). Additionally, an EMG performed on January 20, 2005, was consistent with left L5-S1 lumbar radiculopathy, (Tr. 403-04), a June 29, 2005, thoracic spine x-ray revealed significant levoscoliosis, marked compression of T6 vertebrae, and an almost complete ankylosis of T5 through T7 with marked focal kyphosis. (Tr. 494). Dr. Stegall has been consistent in his opinion that as a result of Plaintiff's significant back problems, he is simply not capable of working.

Similarly, Dr. Kitchener consistently reported that Plaintiff had significant thoracic spine disease with evidence of myelopathy and a very unstable back which have contributed to his being unable to perform substantial gainful activity. Dr. Kitchener also reported that Plaintiff had increased flexor tone, diminished sensation, muscle weakness, absent ankle jerks, and loss of proprioceptive function, (Tr. 408-09). As with Dr. Stegall's opinion, Dr. Kitchener's opinion is supported by the objective medical evidence of record. *See, supra.*

The clinical findings of the consulting specialists further support Dr. Stegall's and Dr. Kitchener's opinions. For example, pain management specialist Dr. Myers reported that Plaintiff exhibited no sensation along his bilateral L4 and S1 dermatomes, no sensation along his right L5 dermatome, diminished sensation over his left calf, and diminished sensation over his right thigh. (Tr. 488). Orthopedist Dr. Amongero reported that Plaintiff had thoracic kyphosis and diminished deep tendon reflexes bilaterally, (Tr. 490), and neurosurgeon Dr. Taha reported that Plaintiff had abnormal deep tendon reflexes. (Tr. 493).

The only opinions which arguably contradict treating physicians Dr. Stegall's and Dr. Kitchener's opinions are the opinions of examining physician Dr. Duritsch and the non-examining reviewing physician, (Tr. 414-20), and MA.

Under the facts of this case, the Commissioner erred by rejecting the opinions of Plaintiff's treating physicians and by relying, instead, on the opinions of an examining physician and the MA. Therefore, the Commissioner's decision is not supported by substantial evidence on the record as a whole.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to remand the matter for rehearing or to reverse and order benefits granted. The

14

Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. §405(g). If a court determines that substantial evidence does not support the Commissioner's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted); *see also, Newkirk v. Shalala,* 25 F.3d 316 (6th Cir. 1994).

This Court concludes that all of the factual issues have been resolved and that the record adequately establishes Plaintiff's entitlement to benefits. Specifically, as noted above, Drs. Stegall and Kitchener have been Plaintiff's long-term treating physicians, they have opined that Plaintiff is not capable of performing substantial gainful activity, and their opinions are supported by the objective medical evidence. In addition, the only evidence which arguably conflicts with Drs. Stegall's and Kitchener's opinions are the opinions of the non-treating examining physician and the non-treating, non-examining reviewing physician and MA.

At this juncture, the Court notes that the record establishes Plaintiff's admitted illegal drug use. That admission certainly raises the issue of the use of SSD benefits for the purchase of illegal drugs. The Court, of course, does not have the authority to monitor Plaintiff's use of SSD benefits. However, the Court should urge the Commissioner to employ any means he may have to monitor Plaintiff's use of SSD benefits.

It is therefore recommended that the Commissioner's decision that Plaintiff is not disabled and therefore not entitled to benefits under the Act be reversed. It is further recommended that this matter be remanded to the Commissioner for the payment of benefits consistent with the

15

Act. Finally, it is recommended that the Court urge the Commissioner to employ any means he may have to monitor Plaintiff's use of SSD benefits.

March 15, 2011.

*s/ Michael R. Merz*
United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), ©), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).